

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ROBERT C. SARVIS,
*et al.*,

     Plaintiffs,

v.                                   Civil Action No. 3:14cv479

CHARLES E. JUDD,
*et al.*,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' MOTION TO DISMISS (Docket No. 23). At oral argument, Plaintiffs' counsel moved to dismiss Count II of the AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (Docket No. 20) and the motion was granted (Docket No. 33). For the reasons set forth below, the motion to dismiss will be granted as to the remaining claim, Count I.

### FACTUAL BACKGROUND

The Libertarian Party of Virginia, several of its candidates for the United States Senate and House of Representatives, and one independent (non-party) candidate for the United States House of Representatives (collectively, the "Candidates") filed a complaint against members of the Virginia State Board of Elections ("Board of Elections"). (Docket No.

1.)    Pursuant to an Amended Complaint, (Docket No. 20), the Candidates sought declaratory and injunctive relief from Virginia laws and practices that assign independent candidates and candidates from smaller parties a lower place on the voting ballot.    The Candidates allege that these laws and practices violate their First and Fourteenth Amendment rights.    (Am. Compl., Docket No. 20, ¶¶ 40, 54.)

According to Virginia state law, a "party" or "political party" is an organization of citizens of the Commonwealth that, at either of the two preceding statewide general elections, received at least 10 percent of the total vote cast for any statewide office filled in that election.    Va. Code § 24.2-101. To qualify as a "party" or "political party," the organization must have a state central committee and an office of elected state chairman both of which have been continually in existence for the six months preceding the filing of a nominee for any office.    Id.

A "recognized political party," on the other hand, is "an organization that, for at least six months preceding the filing of its nominee for [an] office, has had in continual existence a state central committee composed of registered voters residing in each congressional district of the Commonwealth, a party plan and bylaws, and a duly elected state chairman and secretary."    § 24.2-613.    A "recognized political party" need not have received

10 percent of the total vote cast for a statewide office in either of the last two statewide general elections. The Libertarian Party of Virginia is a recognized political party under Virginia law. (Am. Compl., Docket No. 20, ¶ 6.)

The Board of Elections assigns candidates a place on the ballot in the order prescribed by Va. Code § 24.2-613. Id. ¶ 18. That provision requires that "political party" candidates appear first on the ballot in an order determined by lot. Candidates representing "recognized political parties" appear next on the ballot in an order determined by lot. Independent (non-party) candidates appear last on the ballot in alphabetical order. Because the Candidates are not "political party" candidates, they cannot be placed in the first position on the next ballot. Id. ¶ 21. The Candidates allege that this violates their constitutional rights because candidates who are listed at the top of an election ballot receive an unfair "positional advantage" that fortuitously yields more votes than candidates not listed at the top of the ballot and Virginia has reserved this positional advantage for major parties. Id. ¶ 23, 29.

3

## DISCUSSION

### I.   Legal Standard

The Commonwealth has filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide enough facts to state a claim that is plausible on its face."  Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  A court "will accept the pleader's description of what happened . . . along with any conclusions that can be reasonably drawn therefrom," but "need not accept conclusory allegations encompassing the legal effects of the pleaded facts."  Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 1998); Chamblee v. Old Dominion Sec. Co., L.L.C., 2014 WL 1415095, *4 (E.D. Va. 2014).  "Twombly and Iqbal also made clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations

4

plausibly suggest an entitlement to relief." Id. In considering a motion to dismiss, the court may "properly take judicial notice of matters of public record." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## II.  Count I:  Ballot Order Under Virginia Code § 24.2-613

The importance of a fair and functional electoral system to a representative democracy can hardly be gainsaid. Indeed, the Supreme Court has found it "beyond cavil that voting is of the most fundamental significance under our constitutional structure." Burdick v. Takushi, 504 U.S. 428, 433 (1992) (internal citations and quotations omitted).

Of course, the right to vote in any manner one wishes is not "absolute." See id. And, without a meaningful system to capture and reflect the will of the People, the right to vote is a mere abstraction. Therefore, while the rights of the voters are fundamental, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." Anderson v. Celebrezze, 460 U.S. 780, 788 (1983). If elections "are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes," Storer v. Brown, 415 U.S. 724, 730 (1974), then "[c]ommon sense, as well as constitutional law, compels the

5

conclusion that government must play an active role in structuring elections," Burdick, 504 U.S. at 433. Hence, States may enact "comprehensive and sometimes complex election codes" notwithstanding the fact that "[e]ach provision of these schemes . . . inevitably affects — at least to some degree — the individual's right to vote and his right to associate with others for political ends." Anderson, 460 U.S. at 788.

As the Candidates' complaint reflects, ballot access and voting rights restrictions affect "interwoven strands of liberty." Id. at 787. Ballot access restrictions, for example, "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments." Pisano v. Strach, 743 F.3d 927, 932 (4th Cir. 2014). Because "the rights of voters and the rights of candidates do not lend themselves to neat separation," Anderson, 460 U.S. at 786, the Supreme Court has "minimized the extent to which voting rights cases are distinguishable from ballot access cases," Burdick, 504 U.S. at 438. Rather than conducting separate, crosscutting analyses of electoral restrictions under the rubrics of associative rights, expressive rights, due process, or equal protection, the Supreme Court has articulated a single framework for evaluating the constitutionality of state election laws "based . . . directly on the First and Fourteenth Amendments." Anderson, 460 U.S. at 787 n.7; see also Pisano, 743 F.3d at 934.

This framework, established in <u>Anderson v. Celebrezze</u> and refined in <u>Burdick v. Takushi</u>, holds that "the State's asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the party's rights." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 364 (1997) (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 288-89 (1992)).   To apply the <u>Anderson/Burdick</u> test, the Court is guided by the following procedure:

> [The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.  Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

<u>Anderson</u>, 460 U.S. at 789.   "Depend[ing] upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights," the regulation will either face strict scrutiny review or a more deferential standard of review. <u>Burdick</u>, 504 U.S. at 434.   When the plaintiffs' "rights are subjected to 'severe' restrictions, the regulation must be narrowly drawn to advance a state interest of compelling

importance.   But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."  Id. (internal citations and quotations omitted). In other words, modest burdens are balanced "against the extent to which the regulations advance the state's interests," Pisano, 743 F.3d at 936, but there is a presumption that important state interests are "generally sufficient to justify reasonable, nondiscriminatory restrictions," Wood v. Meadows (Wood II), 207 F.3d 708, 715-717 (4th Cir. 2000) (citing Anderson, 460 U.S. at 789).   Justice O'Connor summarized the rationale for this flexible approach in Clingman v. Beaver:

> This regime reflects the limited but important role of courts in reviewing electoral regulation.  Although the State has a legitimate — and indeed critical — role to play in regulating elections, it must be recognized that it is not a wholly independent or neutral arbiter.  Rather, the State is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit. Recognition of that basic reality need not render suspect most electoral regulations. Where the State imposes only reasonable and genuinely neutral restrictions on associational rights, there is no threat to the integrity of the electoral process and no apparent reason for judicial intervention. As such restrictions become more severe, however, and particularly where they have discriminatory effects, there is increasing

8

> cause for concern that those in power may be using electoral rules to erect barriers to electoral competition. In such cases, applying heightened scrutiny helps to ensure that such limitations are truly justified and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.

544 U.S. 581, 603 (2005) (O'Connor, J., concurring) (emphasis added). The foregoing principles guide the analysis of the Candidates' contention that the Commonwealth has offended their rights by using a ballot that provides a "positional advantage" that, in turn, channels "windfall votes" to the Commonwealth's largest parties, while depriving smaller parties and independent candidates of the same opportunity to capture those "windfall votes."

### A.    The Candidates' Burden

The first step in the Anderson/Burdick analysis is to "consider the character and magnitude of the asserted injury" to the Candidates' constitutional rights. Examining the character and magnitude of the burden is pivotal because this assessment determines whether the Commonwealth's interests must be compelling and whether the Commonwealth's selected means must be narrowly tailored to its interests. When the restrictions imposed by the Commonwealth are neutral in character and reasonable in magnitude, the Court conducts a more deferential

9

constitutional analysis and the Commonwealth's important interests will usually prevail.

The alleged burden in this case is that "candidates listed lower on the ballot are placed at a disadvantage compared to those who are listed in the top positions" due to a phenomenon known as "positional bias." (Am. Compl., Docket No. 20, ¶ 25); (Tr. of Oral Arg. 6, 44). "Positional bias" is the notion that higher ballot position – especially the first ballot position – "carries with it a certain statistical advantage." Clough v. Guzzi, 416 F. Supp. 1057, 1062 (D. Mass. 1976). This perceived advantage is said to exist because of "the voting habits of a segment of the total electoral vote sometimes referred to as the 'windfall vote' or 'donkey vote', i.e., the vote cast by citizens who are either uninformed about or indifferent to any or all of the candidates for a particular office on the ballot." Id. at 1063. According to this theory, the candidates placed higher on the ballot receive more votes than those placed lower on the ballot "not from any thoughtful or meaningful choice by voters, but from . . . voter fatigue, apathy or confusion." Graves v. McElderry, 946 F. Supp. 1569, 1579 (W.D. Okla. 1996).

Of course, the existence of this phenomenon alone is not – and could not be – the burden; rather, the restriction at issue is Virginia's statutory scheme, which involves placing the candidates of the established, and larger, parties ahead of

10

smaller parties and independents on the ballot, thereby depriving the Candidates of an opportunity to reap the windfall vote. That occurs because the Commonwealth uses the so-called "tiered ballot order," a method employed by twenty-one other states. (Def. Ex. 2, State Survey, Docket No. 24-2.) The Commonwealth places "political parties" first, "recognized political parties" second, and independent (non-party) candidates third. Va. Code § 24.2-613. Within the first and second categories, candidate order is determined by random drawing. Id. Within the third category, candidates are ordered alphabetically. Id. In order to qualify as a political party and be eligible for the first tier lottery, a party must receive at least 10 percent of the total vote cast for any statewide office in either of the two preceding general elections. Id. § 24.2-101. The cumulative effect of ballot-ordering regulations is to reserve the so-called "positional advantage" for larger parties with more widespread support. Cf. Pisano, 743 F.3d at 933 ("When deciding whether a state's filing deadline is unconstitutionally burdensome, we evaluate the combined effect of the state's ballot-access regulations.").

The existence and degree of the "windfall-vote phenomenon" that underlies the asserted "positional advantage" theory is highly debated and subject to a multitude of confounding variables. See Clough, 416 F. Supp. at 1063 ("A number of

11

written studies . . . purpor[t] to demonstrate the effects of the designation of . . . first position on the outcome of elections.    Some  of  them  support,  and  some  contradict, plaintiff's factual premise."); New Alliance Party v. New York State Bd. of Elections, 861 F. Supp. 282, 288-90 (S.D.N.Y. 1994) (discussing the effect of incumbency, party affiliation, and race visibility on positional bias).   However, for the purpose of resolving this motion, the Court assumes that the windfall-vote  phenomenon[1]  exists  and  that  some  positional  advantage accrues to those candidates whose names appear at the top of the ballot.

The Court is also initially skeptical that the windfall vote, if it does exist, is a burden of constitutional concern. It is not entirely clear that positional bias claims should have any constitutional significance because the theory of injury for such  claims  has  been  predicated  to  date  upon  the  troubling notion that "windfall" votes are meaningless compared to "real" votes  and  thereby  dilute  the  impact  of  votes  cast  by  more "thoughtful" or "informed" voters.[2]

---

[1] The exact quantification of this phenomenon is not at issue. When asked at oral argument whether the Candidates intended to introduce evidence of the percentage at stake, counsel responded that their proposed expert "will not give a number."     (Tr. of Oral Arg. 59.)    Instead, counsel for the Candidates took the view that the number does not make a difference.   Id.

[2] See Gould v. Grubb, 536 P.2d 1337, 1343 (Cal. 1975) (holding

In typical vote dilution cases, malapportionment among fixed districts results in votes from large districts counting for less than votes cast in small districts because it takes a larger number of voters in the former district to have the same electoral impact as a smaller number of voters in the latter district. That form of disenfranchisement violates the constitutional principle of "one person, one vote" because each individual's vote is not accorded the same weight. See Reynolds v. Sims, 377 U.S. 533, 567 (1964).

On the other hand, under the prevailing positional bias case law, the Court is implicitly asked to look behind the motivations of individual voters and hold that their *reasons* for voting are invalid and have had the effect of making other voters' ballots less meaningful as a result. It is worth remembering that the "windfall vote" is not just a statistical anomaly of the social sciences; it represents individuals who went to the polls and cast ballots in a constitutionally protected exercise of their democratic rights. And, "an irrational vote is just as much of a vote as a rational one."

---

that an "election practice which reserves such an advantage for a particular class of candidates inevitably dilutes the weight of the vote of all those electors who cast their ballots for a candidate who is not included within the favored class"); Graves, 946 F. Supp. at 1579("This accrual of randomly or irrationally selected windfall votes causes a dilution of the number of votes which are meaningfully and thoughtfully cast by more careful or interested voters at the election polls.").

New Alliance, 861 F. Supp. at 297. If candidates want the votes of uninformed voters, they should inform them. Clough, 416 F. Supp. at 1067 ("[Candidates] have access to those voters and may, in theory and possibly in practice, so educate them as to eliminate the donkey vote and thus eliminate the statistical position bias."). Moreover, and perhaps unfortunately, there is "no constitutional right to a wholly rational election, based solely on reasoned consideration of the issues and the candidates' positions, and free from other 'irrational' considerations." Id; see also Schaefer v. Lamone, 2006 U.S. Dist. LEXIS 96855, *12 (D. Md. Nov. 30, 2006), aff'd, 248 Fed. App'x. 484 (4th Cir. 2007).

Yet, the Candidates here have not explicitly cast their complaint in terms of vote dilution. Their contention is that ballot ordering requirements deprives them of a chance at the "windfall vote."

The ballot is accepted as "the state devised form through which candidates and voters are permitted to express their viewpoints." Graves, 946 F. Supp. at 1578. Because the ballot is an inherently and necessarily limited vehicle for political expression, the format and structure of the ballot may implicate expressive rights and present a cognizable restriction for the purposes of conducting the Anderson/Burdick analysis. See Burdick, 504 U.S. at 437-39 (weighing petitioner's claimed right

14

to cast a "protest vote" under the Anderson framework and holding that the State's restriction "imposes only a limited burden on voters' rights to make free choices" because elections serve "to winnow out and finally reject all but the chosen candidates" rather than "a generalized expressive function").

Even assuming that positional bias exists and that it may be cause for constitutional concern, the Court concludes - and the parties agree - that the burden at issue in this case is not severe. (Tr. of Oral Arg. 45, 53.) Notwithstanding that agreement, it is useful to understand why the alleged burden is not a severe one.

To begin, the tiered approach here at issue is politically neutral notwithstanding the fact that it favors the traditional two-party system. The Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." Burdick, 504 U.S. at 438. Thus, when a regulation is facially neutral and not "unreasonably exclusionary," it "may, in practice, favor the traditional two-party system." Timmons, 520 U.S. at 367.[3] That is Virginia's tiered-system.

---

[3] Anderson distinguished between restrictions that permissibly "favor a 'two-party system'" and those that impermissibly favor "two particular parties - the Republicans and the Democrats - and in effect ten[d] to give them a complete monopoly" through the "virtual exclusion of other political aspirants from the political arena." Anderson, 460 U.S. at 802 (citing Williams v.

First, Virginia's laws do not entrench particular, identifiable parties in power or foreclose smaller parties and independents from competing in any meaningful way.[4] By placing *any* party that has received at least 10 percent of the vote in the first tier of the ballot, the regulation "in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life." Jenness v. Fortson, 403 U.S. 431, 439 (1971).

Second, tiered ballot ordering laws, such as Virginia's, that distinguish between parties with widespread electoral support and parties with less demonstrable electoral success have also been found neutral specifically in contrast to ballot ordering laws that place particular parties first on the ballot. Compare Graves, 946 F. Supp. at 1579 (holding unconstitutional a law that "effectively selects Democratic party candidates for public office for the top position . . . on any General Election ballot.") and Sangmeister v. Woodard, 565 F.2d 460, 462 (7th Cir. 1977) (holding unconstitutional a "practice by Illinois

---

Rhodes, 393 U.S. at 23, 31–32).

[4] The ballot ordering laws provide a reasonable and neutral system with a first tier threshold that can be, and has been, surpassed by third parties. (Def. Ex. 1, Declaration of Custodian of Records, Docket No. 24-1, at ¶¶ 6, 7, Ex. E at 32, Ex. F at 35) (listing the Virginia Reform Party, f/k/a Virginia Independent Party, first on the 1996 general election ballot after its 1994 nominee for U.S. Senate received 11.4% of the vote).

County Clerks of placing their own political party in the first or top position on voting ballots in all general elections") with Libertarian Party of Colorado v. Buckley (Buckley I.), 938 F. Supp. 687, 692 (D. Colo. 1996) ("Unlike the ballot position statute at issue in Graves, Colorado's statute is facially neutral.  It does not classify candidates eligible for the first-tier ballot positions by party affiliation, nor does it relegate 'all candidates for public office other than those nominated by the Republican or Democratic Parties' to a second-tier position as Plaintiffs suggest.") and Bd. of Election Comm'rs of Chicago v. Libertarian Party of Illinois, 591 F.2d 22, 25 (7th Cir. 1979) ("In Sangmeister, [we required on remand] that 'the procedure adopted . . . be neutral in character.' Different treatment of minority parties that does not exclude them from the ballot, prevent them from attaining major party status if they achieve widespread support, or prevent any voter from voting for the candidate of his choice, and that is reasonably determined to be necessary to further an important state interest does not result in a denial of equal protection.").

Even if the law could be considered facially discriminatory against smaller parties with limited electoral support, a discriminatory burden is not ipso facto a severe one.  See Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of

17

Elections, 174 F.3d 305, 312, 315 (3d Cir. 1999) (holding that prescribing different fusion rules for major and minor parties "is, on its face, discriminatory," but applying "an intermediate level of scrutiny . . . to weigh, against the burdens imposed, any plausible justification the State has advanced"). The Fourth Circuit, for example, has not treated laws that classify on this basis as inherently severe. Compare McLaughlin v. N. Carolina Bd. of Elections, 65 F.3d 1215, 1221 (4th Cir. 1995) ("[T]he burden that North Carolina's ballot access restrictions impose on protected interests is undoubtedly severe.") with Pisano, 743 F.3d at 936 ("[W]e conclude that the [filing deadline] burden on Plaintiffs is modest. Because the deadline does not impose a severe burden, . . . we simply 'balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests[.]'"). Here, as in Libertarian Party of Colorado v. Buckley (Buckley II), 8 F. Supp. 2d 1244, 1248 (D. Colo. 1998), the alleged discriminatory burden is "all but illusory" because "the Libertarian Party need only obtain 10% of the vote to [qualify for the first tier on the ballot]. . . . [A]ny assertion that 10% of the vote is unattainable reveals self-doubt uncharacteristic of any political party, let alone one whose candidates have already qualified for the ballot in previous elections." Id.

18

Next, the ballot order regulation in Virginia is also a far cry from the kinds of restrictions that warrant strict scrutiny. For example, as in Timmons, the Virginia ballot format does not "restrict the ability of the [party] and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking." Timmons, 520 U.S. at 363. As the Sixth Circuit has explained, "If a restriction does not affect a political party's ability to perform its primary functions, such as organizing, recruiting members, and choosing and promoting a candidate, the burden typically is not considered severe." Green Party of Tennessee v. Hargett, 767 F.3d 533, 547 (6th Cir. 2014) (internal quotations omitted).

The Candidates do not allege that they have been excluded from competing on the ballot. They have not been. There is no disputing that those who desire to vote for a Libertarian candidate or any other recognized political party or independent candidate can find their candidate of choice on the ballot, "a task made faster and easier by virtue of" the tiered design. See Schaefer, 2006 U.S. Dist. LEXIS 96855, at *12. "All that [the Candidates] really alleg[e] is that [their] opportunity to capture the windfall vote has been impeded." New Alliance, 861 F. Supp. at 295. That singular allegation of infirmity is

19

significant because it demonstrates that the Commonwealth's restriction in no way "limit[s] the opportunities of independent-minded voters to associate in the electoral arena." Anderson, 460 U.S. at 794. Furthermore, the argument that "windfall voters" are prevented from associating with the party of their choosing is an argument at war with itself. By definition, windfall voters have disregarded association in making their choice. If they have not, then they are not windfall voters. In short, any burden imposed by Virginia's ballot order statute is a minor one.

Neither the Candidates nor the Commonwealth argue that strict scrutiny is warranted here. (Tr. of Oral Arg. 45, 53.) The Court agrees. Those who desire to vote for a recognized political party candidate or an independent candidate face no barrier to doing so. Because the regulations at issue impose, at most, a modest burden on the Candidates' First and Fourteenth Amendment rights, the Court will undertake the more deferential constitutional analysis.

## B. The State's Interests

Under the second step of the Anderson/Burdick framework, the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789. Because the regulations pose only a modest burden, the regulations need not be

20

compelling or narrowly tailored. Burdick, 504 U.S. at 434. The Commonwealth advances three justifications for its tiered ballot order: avoiding voter confusion, party-order symmetry, and favoring parties with demonstrated public support.

Before evaluating the legitimacy and strength of the Commonwealth's identified interests, however, the Court must address the Candidates' threshold contention that such evaluation is not permissible at this juncture because the Commonwealth has not demonstrated through empirical evidence that its laws further or advance the foregoing interests. (Tr. of Oral Arg. 45-47.) The Candidates rely upon Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections to make the point that courts must "insist on knowing the relation between the classification adopted and the object to be attained" and that, "unlike rational basis review, the intermediate standard of review . . . 'does not permit the Court to supplant the precise interests put forward by the State with other suppositions.'" 174 F.3d at 315-16. The Candidates also argue that the Supreme Court has required more demanding evidentiary support under the intermediate standards of review applied in gender-based equal protection claims and certain free speech claims. See United States v. Virginia, 518 U.S. 515, 536, 539 (1996) (undertaking a "searching analysis" and finding "no persuasive evidence in th[e] record" that the rule in

21

question was "in furtherance of a state policy of 'diversity'"); Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 195 (1997) (according "substantial deference to the predictive judgments of Congress," but "assur[ing] that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence").

The Candidates' position is not an illogical one. First, the standard of review applied to modest burdens under Anderson/Burdick occasionally has been characterized as "intermediate" by courts. See, e.g., Reform Party of Allegheny Cnty., 174 F.3d at 314. Second, courts employing the Anderson/Burdick framework frequently refer to the State's "important regulatory interests," which bears a striking similarity to most intermediate scrutiny tests. See United States v. Virginia, 518 U.S. at 533 ("The States must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.") (internal quotations omitted); Turner, 520 U.S. at 189 ("A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."). Lastly, the Fourth Circuit itself has remanded a

22

filing deadline case "for further factual development as to the burdens [of a filing deadline], and as to the interests of the Commonwealth in imposing that deadline." Wood v. Meadows (Wood I), 117 F.3d 770, 776 (4th Cir. 1997) (emphasis added).

However, the weight of authority is not on the Candidates' side. Although there is a *presumption* that reasonable and nondiscriminatory election regulations will usually be upheld when the State proffers important state interests, Wood I, 117 F.3d at 773, the Anderson/Burdick test itself has been described as "flexible" because the "State's asserted regulatory interest need only be sufficiently weighty to justify the limitation imposed." Timmons, 520 U.S. at 364 (quoting Norman, 502 U.S. at 288-89). If the test consistently demanded intermediate scrutiny, the Burdick Court would not have found the "legitimate interests asserted by the State [to be] sufficient to outweigh the limited burden that the [restriction] impose[d] upon [the State's] voters." 504 U.S. at 440 (emphasis added); see also Beaver, 544 U.S. at 587 ("We are persuaded that any burden [the restriction] imposes is minor and justified by legitimate state interests.") (emphasis added). These holdings bespeak a balancing test with a wide spectrum of outcomes. See Anderson, 460 U.S. at 789 (declining to apply a "litmus-paper test"); Pisano, 743 F.3d at 936 (balancing the "character and magnitude of the burdens imposed against the extent to which the

23

regulations advance the state's interests"); Democratic-Republican Org. of New Jersey v. Guadagno, 900 F. Supp. 2d 447, 453 (D.N.J. 2012) aff'd, 700 F.3d 130 (3d Cir. 2012) (holding that Anderson "promulgated a less categorical system of classification" that is a "weighing process" not "pegged into the three [scrutiny] categories"). And, while the Fourth Circuit in Wood I remanded for factual development both as to the burdens and the interests, the Anderson framework had not yet been applied by the lower court at all. Wood I, 117 F.3d at 774. When the Plaintiff in that case appealed again, alleging that "the state must factually demonstrate the extent to which its interests make it necessary to burden the plaintiff's rights" even short of strict scrutiny, the Court firmly rejected the proposition, explaining that such an analysis is generally "limited to [regulations] that constitute an unreasonable, discriminatory burden." Wood II, 207 F.3d at 715, 716.[5]

It is true that, under Anderson, the Court must "identify and evaluate the precise interests put forward by the State," but precision does not equate to empiricism. The Court "insist[s] on knowing the relation between the classification

---

[5] In Wood II, the plaintiff argued that the Commonwealth was required to "factually demonstrate" with empirical evidence the extent to which the State interest necessitates the burden at issue. Id. at 715. The Fourth Circuit held that "the Anderson test simply does not require that a state justify 'reasonable, nondiscriminatory ballot access restrictions in this manner." Id. at 716.

adopted and the object to be attained" and will not "speculate about possible justifications" or "supplant the precise interests put forward by the State" with merely conceivable interests as it might under rational basis review. Reform Party of Allegheny Cnty., 174 F.3d at 315-16. But there is a difference between requiring the Commonwealth to clearly articulate precise interests with arguments tethered by reason and requiring the Commonwealth to produce hard data evidencing the teleological relation between the law and its stated aims.

Unless strict scrutiny is warranted, the Commonwealth need only marshal its interests and present a logical nexus. That enables the Court to conduct the weighing of precise interests required by Anderson. If the Commonwealth makes "no effort . . . to show why [its] interests justify [the regulation]" or the Court finds the reasons "unpersuasive" or the law "too broad or too narrow" to be justified, then the Court can hold the latter insufficient. Id. at 316-18. The Supreme Court has instructed no differently. See Timmons, 520 U.S. at 366 n.10 (weighing the State's "strong interest in the stability of [its] political syste[m]" based on the State's briefing and oral arguments); id. at 375, 377 (Stevens, J., dissenting) (noting that "the State's asserted interests must at least bear some plausible relationship to the burdens it places on political parties" and "the State has not convincingly articulated" how the statute

25

advances its interest); id. at 383 (Souter, J., dissenting) (holding that "our election cases restrict our consideration to 'the precise interests put forward by the State'" and courts must "judge the challenged statutes only on the interests the State has raised in their defense").

Moreover, it would be a curious rule that demanded the Commonwealth to prove empirically that its law furthered an interest that it did not need to prove empirically. In Timmons, the Supreme Court was quite clear that it did not require "elaborate, empirical verification of the weightiness of the State's asserted justifications." 520 U.S. at 364. "States are not required 'to make a particularized showing of the existence of voter confusion . . . prior to the imposition of reasonable restrictions.'" Pisano, 743 F.3d at 937 (citing Munro v. Socialist Workers Party, 479 U.S. 189, 194-95 (1986)). Rather, "Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight . . ., provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." Munro, 479 U.S. at 195. Holding otherwise "would invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State." Id. The same considerations apply here. The Candidates have aired conclusory doubt about the ballot's efficacy and thereby claim to have raised a factual

26

dispute that forecloses dismissal at this stage of the case. However, the Commonwealth should not be made to carry a burden that is not legally its to bear. Demanding empirical evidence to support the imposition of every routine and ordinary electoral regulation would "hamper the ability of States to run efficient and equitable elections." Beaver, 544 U.S. at 593.[6] And, it runs contrary to the explicit holdings of the Supreme Court and the Fourth Circuit.

In order to "identify and evaluate" governmental interests when the State has implemented reasonable and nondiscriminatory electoral restrictions, the Court must rely solely upon the precise interests put forth by the State, determine the legitimacy and strength of the interests, and ensure that the State's articulated rationale bears a plausible relationship to the burden imposed. The Court does not require elaborate, empirical verification that the State's interest is a weighty one or that the regulation chosen advances that interest. This approach distinguishes even the most forgiving Anderson analysis from rational basis review but exhibits an appropriate deference to the legislature's reasonable and nondiscriminatory judgments in a field explicitly reserved for a coequal branch. U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of

---

[6] Moreover, the conclusory allegations on which the Candidates rely would not suffice under Twombly and Iqbal even if the law were otherwise.

holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof").

### 1.   Avoiding Voter Confusion

The first interest identified by the Commonwealth is its interest in avoiding voter confusion.  Developing and ordering ballots in a comprehensible and logical fashion helps prevent voter confusion and constitutes a compelling interest..  See Schaefer, 2006 U.S. Dist. LEXIS 96855 at *12; see also New Alliance, 861 F. Supp. at 296 (holding that states have a compelling interest in "organizing a comprehensible and manageable ballot.").  As the court explained in New Alliance,

> A manageable ballot is one where the parties, offices and candidates are presented in a logical and orderly arrangement. Were the ballot to be arranged in a scattershot fashion, the average voter would be unable to discern an underlying rationale to the ballot's organization. Identifying candidates who can demonstrate the support to qualify for party affiliation and separating them from those who cannot is one method of keeping the ballot in a format that the voter can easily read and assimilate.

861 F. Supp. at 296.

According to the Commonwealth, tiered ballot ordering, unlike randomized and alphabetical ordering, allows voters to easily and quickly find candidates by party. (Def.'s Mot. to Dismiss, Docket No. 24, at 15.)  By "simplifying the ballot order" and "having a clear ordering [by] party," the

Commonwealth avoids voter confusion and makes it easier for voters to find candidates by party affiliation. (Tr. of Oral Arg. 22, 33-34.)

The Commonwealth's justification is not just plausible. It is eminently reasonable and logical. The Commonwealth has identified, and properly advanced, a state interest that is at least important, if not compelling.

### 2. Party-Order Symmetry

The second interest identified by the Commonwealth is its interest in party-order ballot symmetry. Streamlining the ability for voters to engage in "straight party voting" through party levers or other devices is an "important interest" because it speeds up the election process. See Meyer v. Texas, 2011 WL 1806524, *5 (S.D. Tex. 2011). In addition, courts have found that "constructing a symmetrical pattern on the ballot" also falls within the "need to construct and order a manageable ballot and prevent voter confusion." New Alliance, 861 F. Supp. at 297.

The Commonwealth argues that tiered ballot ordering, unlike randomized and alphabetical ordering, also makes party symmetry across offices possible. (Def.'s Mot. to Dismiss, Docket No. 24, at 15); (Tr. of Oral Arg. 23). "Voters see that the order is the same in each contest, making it easier to find the party-affiliated candidate of their choosing." (Def.'s Mot. to

Dismiss, Docket No. 24, at 15.)   In addition, "if you want to vote along party lines, it makes it easier for you to do that." (Tr. of Oral Arg. 22.)

Courts have recognized the government's interest in reducing voter confusion through a logical and comprehensible ballot format and improving the speed and ease with which voters cast their ballots.   By maintaining the same party order across all offices on the ballot, the Commonwealth has implemented a system that is likely to improve the accuracy and efficiency of the voting process, an important state interest.

### 3.   Favoring Parties with Demonstrated Public Support

The third interest identified by the Commonwealth is its interest in favoring parties that have demonstrated widespread support.   This interest has been articulated in many ways, including "political stability," "preventing excessive factionalism," and "preventing party-splintering," although these labels are not entirely interchangeable.   In Timmons, the Supreme Court held that States "have a strong interest in the stability of their political systems" and can "enact reasonable election regulations that may, in practice, favor the traditional two-party system."   520 U.S. at 366-67.   Although "unreasonably exclusionary restrictions" will not be upheld, several courts have found it reasonable to condition ballot position upon past electoral performance or ballot access

method.  See Bd. of Election Comm'rs of Chicago, 591 F.2d at 27
("[W]e think that it was permissible to . . . make the ballot as
convenient and intelligible as possible for the great majority
of voters, who, history indicated, would wish to vote for a
candidate of one of the two major parties."); New Alliance, 861
F. Supp. at 299 ("[T]o assure the orderly conduct of elections,
a State may design a ballot which rationally distinguishes
between those entities that previously attracted significant
public support and those that did not."); Meyer, 2011 WL 1806524
at *6 ("[F]ederal courts have noted a state's legitimate
interests in basing ballot placement upon a showing of past
strength among the electorate."); Democratic-Republican Org. of
New Jersey, 900 F. Supp. 2d at 459 ("[I]t is important for
voters to easily identify these candidates and parties on the
ballot, which is accomplished by ensuring that candidates for
political parties are clearly separated on the ballot from
candidates nominated by petition.").

The Commonwealth contends that its ballot does not solely
advantage two parties, but rather encourages "larger parties
over a multiplicity of parties" by favoring "parties that have
ten percent or more of the vote." (Tr. of Oral Arg. 25.)  By
placing larger parties at the top of the ballot, the
Commonwealth gives "most voters who favor one of the major party
candidates the easiest ability to find them on a ballot,

particularly if [there are] a number of candidates on the ballot." Id. at 34.[7] The Commonwealth claims that such an interest is permissible in the wake of Timmons.

The Commonwealth is correct. "The Constitution permits the . . . Legislature to decide that political stability is best served through a healthy two-party system." Timmons, 520 U.S. at 367. If Virginia employs reasonable and neutral ballot ordering regulations, these regulations may favor the consolidation of larger parties. It is also quite plausible that the ballot format makes voting easier and more efficient for the vast majority of voters. By distinguishing between parties that have garnered more widespread electoral support and those that have not, the ballot provides a logical order that enhances the ability of voters to quickly comprehend important and objective information about the candidates and that fosters the stability of Virginia's political system.

## C. The Constitutional Analysis

The final step in the Anderson/Burdick analysis is to weigh all of the factors and consider the extent to which the Commonwealth's interests make it necessary to burden the

---

[7] The Court takes judicial notice of the fact that "[t]he vast majority of voters will choose a candidate from one of the major parties." (Def.'s Mot. to Dismiss, Docket No. 24, at 16.) See Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (noting it was proper during Rule 12(b)(6) review to consider publicly available statistics on an official government website).

plaintiff's rights. See Anderson, 460 U.S. at 789. Because the ballot ordering regulations are reasonable and neutral, there is a presumption that the State's important regulatory interests will prevail. Id. at 788. Virginia has recited a number of interests that are important, if not compelling, and has shown that its ballot design furthers those interests. The ballot ordering regulation is constitutional on that basis alone.

Yet, even if the Commonwealth's classification based on a reasonable threshold of prior electoral success required weighing, the burden alleged here would remain a minor one and the statute would survive Anderson's balancing test. "[T]o the extent that the plaintiff[s] experienc[e] any injury to [their] constitutional rights from [their] inability to be listed first on the ballot, that minor injury is outweighed by the state's regulatory interests in organizing a clear and intelligible ballot, presenting a logical arrangement based on the reasonable and nondiscriminatory basis of historical strength of support, and displaying candidates in a simple way that avoids voter confusion." Meyer, 2011 WL 1806524 at *6; see also Schaefer, 2006 U.S. Dist. LEXIS 96855 at *12 ("Even assuming that the burden on candidates and voters rises to the level of a constitutional harm, the State's interests outweigh that burden."); Buckley II, 8 F. Supp. 2d at 1249 ("Assuming, for the sake of argument, that the Ballot Position Statute infringes

33

even slightly on voting rights, I reiterate my conclusion . . . that the character and magnitude of any such infringement is outweighed by the State's interest in regulating and organizing their elections.") (internal quotations omitted); Democratic-Republican Org. of New Jersey, 900 F. Supp. 2d at 459-60 ("Because the Plaintiffs' burden, if any, is negligible, any reasonable regulatory interest provided by the State will ensure the statutes' constitutionality under Anderson. . . . I am satisfied that [the statutes] do not violate the Equal Protection Clause or the First Amendment."). The Court concurs in the thoughtful analyses conducted by its sister courts throughout the country.

While randomized or rotational ballots may address the phenomenon of which the Candidates' complain (capture of the "windfall vote"), even courts that have found ballot ordering provisions constitutionally infirm have not found it "appropriate . . . to mandate a single form of procedure that must be followed in every election." Gould, 536 P.2d at 1343. This hesitancy reflects the very reason for a deferential review of the ballot design chosen by the Commonwealth. As the court observed in Clough v. Guzzi,

> [N]one of the available alternatives are themselves without disadvantages. Alphabetical order or a lottery would, in the end, give only one candidate first position, and would arguably entail an even

> more arbitrary system than the present one.
> The rotational system, . . . which a number
> of states have adopted, would presumably
> allow all candidates to occupy first
> position on an equal number of ballots, and
> thus share equally in the advantage.
> However, the system is more burdensome to
> administer and more costly because of the
> necessity of printing more than one ballot;
> some critics say that it is also more
> susceptible to tabulation error. Without
> meaning to overstate these difficulties,
> which may well be offset by the greater
> equity or appearance of equity provided by
> the rotational system, still we cannot say
> that a legislature could not rationally give
> some weight to them in declining to adopt
> such a system.

Clough, 416 F. Supp. at 1068. If Virginia has articulated a

sufficiently weighty reason for its ballot design and employed

reasonable regulations in its service, then the Commonwealth has

acted within constitutional bounds and this Court may not stand

in judgment of that discretion properly exercised by the

legislative body. Virginia has met its obligations.

For the foregoing reasons, the Commonwealth's tiered ballot

ordering law is constitutional and the Commonwealth's motion to

dismiss will be granted as to Count I.

## CONCLUSION

For the foregoing reasons, DEFENDANTS' MOTION TO DISMISS (Docket No. 23) will be granted as to Count I and denied as moot as to Count II, which has been dismissed voluntarily by the plaintiffs.

It is so ORDERED.


                                    /s/      REP
                              Robert E. Payne
                              Senior United States District Judge

Richmond, Virginia
Date: January 13, 2015